**Catherine TANKS, Plaintiff,**

v.

**GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY, Defendant.**

**No. C88–2251.**

United States District Court, N.D. Ohio, E.D.

April 25, 1990.

Alan Belkin, Shapiro, Turoff, Gisser & Belkin, Avery S. Friedman, Cleveland, Ohio, for plaintiff.

Lee J. Hutton, Andrew C. Meyer, Duvin, Cahn & Barnard, Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION RE: GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KRENZLER, District Judge.

The Plaintiff, Catherine Tanks, filed a Complaint with this Court against her former employer, the Greater Cleveland Regional Transit Authority ("RTA"). In her Complaint, Plaintiff, a former bus driver, alleges that the RTA, a governmental entity, violated her constitutional right to privacy, under the Fourth Amendment, by requiring her to submit to a drug test following an accident involving an RTA bus driven by her. Plaintiff also claims that her subsequent discharge by the RTA for testing positive for cocaine was unconstitutional as it was based on an unconstitution-

al search. Defendant, RTA, answered plaintiff's Complaint and the parties engaged in discovery.

Presently pending before the Court is Defendant's Motion For Summary Judgment on plaintiff's claim under 42 U.S.C. § 1983, that the RTA violated her constitutional right to privacy by requiring her to submit to a drug test following an accident involving a RTA bus driven by her. In support of the motion, defendant has submitted evidentiary material including affidavits of James Clark, the Director of Bus Transportation for the RTA, Neil Fortner, the Scientific Director of Toxicology at Southgate Medical Laboratory, Inc., Edward Butler, zone supervisor for RTA, Lavonia Pitts, a phlebotomist employed by Southgate Medical Laboratory, Inc., Martin T. Wymer, attorney, and member of the RTA's Task Force on Drug and Alcohol Abuse, a copy of the Southgate Medical Laboratory's Medical Legal—Chain of Specimen Custody Form, and a transcript of Plaintiff's Deposition. The plaintiff filed an unsupported brief in opposition.

### I

A review of the pleadings, deposition, affidavits and other evidentiary material reveals the following relevant facts.

The RTA is a regional transit authority which provides public transportation services to approximately 240,000 people daily in Northeastern Ohio. The RTA operates passenger buses, rapid transit lines, and special community responsive transit vehicles (designed to transport the physically handicapped). On a typical business day, there are over 550 buses in operation.

In February of 1986 the RTA implemented a comprehensive "Alcohol and Drug Abuse Policy" ("Drug Policy") designed to detect and deter; (1) employees who use drugs and/or alcohol on the job, and (2) employees who are chronic abusers of drugs and/or alcohol. Plaintiff was aware of the drug policy and under what conditions testing would be required.

The Drug Policy lists a variety of specific circumstances which mandate submission by an employee to toxicological testing for the presence of alcohol and drugs.[1]

On September 11, plaintiff was working a "swing run."[2] After completing her morning run, plaintiff struck a support pole while pulling her bus into the RTA Woodhill Garage. Pursuant to the RTA Drug Policy, plaintiff was required to submit to a drug test because she had hit a fixed object. She agreed to accompany RTA Zone Supervisor, Edward Butler, to the Southgate Medical ("Southgate") facility for testing.[3] Mr. Butler drove plaintiff to Southgate's satellite laboratory.

---

1. GCRTA ALCOHOL AND DRUG ABUSE POLICY
... [A]ny employee will be required to submit to testing ... under the following circumstances:
   At the time of the pre-employment physical examination.
   At the time of any work-related physical examination.
   When two supervisors and/or Transit Police officers concur that the employee appears to be acting in an impaired manner.
   When the employee is in an accident involving:
     a pedestrian
     a fixed object
     two or more RTA vehicles
     an RTA vehicle striking the rear end of another vehicle
     a head-on collision
     an RTA vehicle striking another vehicle broadside
     substantial physical damage
     personal injury
   When an employee is in flagrant violation of standard operating procedures.
   As a condition of discipline due to a previous offense.
   When an employee returns from any unscheduled absence from work whereby two or more consecutive days of absence occurred, the employee may be required to submit to a test.

2. A driver drives her bus on a run during the morning peak traffic hours, goes home for several hours, then returns to drive a run during the late afternoon peak traffic hours.

3. Southgate Medical Laboratory, Inc. employs accepted procedures regarding the chain of custody of collected specimens and state-of-the-art testing technology. This laboratory has been certified by the Federal Department of Health and Human Services to conduct drug testing under the Department of Transportation drug testing regulations issued in 1988 (*See* 49 C.F.R. Part 653 (1988)).

After verifying plaintiff's name and employee number a laboratory technician wrote this information on a Chain of Specimen Custody Form and asked plaintiff whether she was taking any medication and also recorded this information. Plaintiff was also asked to write her name on adhesive labels that were subsequently attached to her test samples. The technician then took two blood samples from plaintiff, and affixed initialed labels to the sample containers before placing them in a refrigerated unit. Plaintiff then provided a saliva sample which was also sealed with an adhesive label.

Plaintiff was next given a specimen jar, directed to a bathroom located off a partitioned area of the lab, and was asked to provide a urine sample which she did voluntarily. After providing her sample, plaintiff handed the specimen container to the lab technician, who then returned to the area where Zone Supervisor Butler was waiting, and affixed an initialed adhesive label across the top of the container lid in Mr. Butler's presence. Thereafter, plaintiff's urine specimen was sent by courier to the main Southgate Medical Laboratory facility.

The specimen was subsequently analyzed for the presence of various psychoactive substances. The initial drug tests revealed a positive showing of cocaine in plaintiff's urine. Thus, pursuant to its established procedures, Southgate ran a second confirming test on plaintiff's sample, employing the "GC/Ms" test. This test, which provides a "fingerprint" of the molecular structure of the metabolites contained in the urine, revealed the presence of the cocaine metabolite in plaintiff's urine.

Accordingly, on September 16, representatives of Southgate Laboratory contacted James Clark, the Assistant Director of Bus Transportation for the RTA, and advised him that plaintiff's urine specimen had tested positive for cocaine. The following day, after a pre-termination hearing with Woodhill District Superintendent Berry Grant, plaintiff was terminated pursuant to the requirements of RTA's Drug Policy.

In summary, while pulling her bus into an RTA garage, plaintiff struck a stationary pole. Plaintiff admitted that this was a preventable accident and was caused by her own mishandling of the bus. Plaintiff understood that hitting a fixed object was one of the circumstances which triggered a drug/alcohol test under the RTA's Drug Policy, and accordingly agreed to accompany Butler to the medical facility for testing. Plaintiff was tested the same day and tested positive for cocaine and was discharged.

## II

The defendant moves for summary judgment on the basis that there is no genuine issue as to any material fact with respect to plaintiff's claim that RTA acted unreasonably, within the meaning of the Fourth Amendment; 1) in requiring plaintiff to take a drug test following her collision with a fixed object. Defendant further states that plaintiff cannot produce evidence which could convince a reasonable trier of fact that the RTA deprived her of her right to be free from unreasonable searches and therefore defendant is entitled to judgment as a matter of law.

■ In order to survive a motion for summary judgment, the nonmoving party, in this case plaintiff, must submit evidence to demonstrate the existence of a genuine issue of material fact as to each element of her claim. As the United States Supreme Court stated in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert. denied* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. at 2552.

■ The purpose of summary judgment is to assess the proof and determine whether there is a genuine reason for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio,*

475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Even in cases involving questions of motive or intent, the court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

■ Summary judgment is proper unless the record contains sufficient evidence favoring the nonmoving party to enable a reasonable jury to return a verdict for that party. *Id.* at 248–50, 106 S.Ct. at 2510–11 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted).

■ The moving party need only show the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554. The nonmoving party must go beyond the pleadings and present specific facts demonstrating that there is a genuine issue for trial and "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Stated another way, the nonmoving party must show triable issues as to all the elements of her claim.

When a nonmoving party fails to place sufficient evidence in the record:

> ... there can be 'no issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2553.

In the instant case the material facts regarding plaintiff's constitutional claims are not in dispute. It is undisputed; 1) that the RTA has a written Drug Policy which requires its bus drivers to submit to blood and urine testing following their involvement in a collision with a stationary object, 2) that the Drug Policy grants the RTA discretion to discharge an employee who tests positive for cocaine and, 3) that the bus driven by plaintiff was involved in a collision with a stationary object, after which she was required to provide saliva, blood and urine samples.

Thus, this case turns upon the legal question of whether the RTA's policy of; 1) requiring bus drivers involved in collisions with stationary objects to take drug tests, is reasonable in the absence of reasonable individualized suspicion that the particular employee is impaired.[4]

### III

Drug abuse is one of the most significant problems affecting the United States today. The Third Circuit Court of Appeals has noted that:

> ... the enormity of the problem facing this country because of drug use is sufficiently well established to justify judicial notice.

*Transport Workers' Union, Local 234 v. SEPTA*, 863 F.2d 1110, 1119 (3d Cir.1988), *vacated,* —— U.S. ——, 109 S.Ct. 3208, 106 L.Ed.2d 560, *reaffirmed,* 884 F.2d 709 (3rd Cir.1989).

The effects of drug abuse have not been limited to the social context, but have also been manifest in the workplace, with devasting human and financial loss and as such, are cause for concern and careful examination. *See* 49 Fed.Reg. at 24253–24254 (Federal Railroad Administration ("F.R.A.") identifies 66 injuries and $28 million in property damage resulting from drug and alcohol-impaired employees in an eight-year period in the railroad industry).

---

**4.** The question before this Court is not the constitutionality of the RTA's entire Drug Policy, but to particular provisions therein. Therefore, this decision is based on the particular facts and circumstances in the case before us as they relate to the constitutionality of those particular provisions contested.

■ In response to this ominous problem of drug abuse in the work place and to the Federal Government's war on drugs, many public employers have been required to utilize drug testing pursuant to federal regulation. *See e.g.* 49 C.F.R. Part 40 (1988) (U.S. Department of Transportation mandates comprehensive employee drug testing, including random testing, under its six operating administrations).

Recently, the U.S. Supreme Court granted certiorari and announced its decisions in two cases which squarely present the issue of whether or not the Fourth Amendment requires a public employer to have individual, reasonable suspicion before requiring its employees to take a drug test. *See Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

In *Skinner*, the Court held that drug testing conducted pursuant to Federal Railroad Administration Regulations ("F.R.A.") which required mandatory drug testing of train crews following certain accidents was reasonable within the meaning of the Fourth Amendment even though the testing was conducted in the absence of reasonable suspicion that a particular employee might be impaired. The Court's landmark holding provides cogent guidance in addressing the constitutionality of public sector employee drug testing.

In determining the constitutionality of the F.R.A. regulations, the Court in *Skinner* initially acknowledged that the collection and testing of blood and urine specimens constituted a search under the Fourth Amendment, and as such, the reasonableness of the drug and alcohol testing was subject to traditional Fourth Amendment analysis. *Id.* 489 U.S. at ——, ——, ——, 109 S.Ct. at 1412, 1413, 1414, 103 L.Ed.2d at 659, 660, 661.

The Court determined that the Fourth Amendment did not require a pre-test warrant given that; 1) the regulations provide for little discretion in determining who to test, 2) the testing is conducted for administrative as opposed to criminal purposes, and 3) adding a warrant requirement would add little to the certainty and regularity of the process. *Skinner* at —— — ——, 109 S.Ct. at 1415–16, 103 L.Ed.2d at 663–664. In so ruling, the Court noted that insistence upon a pre-test warrant would impede the government's purpose behind the search (detecting drug use), given that the delay might result in the destruction of valuable evidence.[5]

The Court noted that, to be reasonable, a search performed without a warrant "must be based, as a general matter, on probable cause to believe that the person to be searched has violated the law" or based on "some quantum of individualized suspicion", but emphasized that a showing of "individualized suspicion [was] not a constitutional floor below which a search must be presumed unreasonable." *Skinner*, at ——, 109 S.Ct. at 1417, 103 L.Ed.2d at 664 (*citing New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985) and *U.S. v. Martinez–Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976)). The Court acknowledged that:

... [W]here the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, *a search may be reasonable despite the absence of such suspicion.*

*Skinner* at ——, 109 S.Ct. at 1417, 103 L.Ed.2d at 664 (*citing United States v. Martinez–Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084) (emphasis added).

Under this analysis, the reasonableness of a given search "depends on all the circumstances surrounding the search ...,

---

**5.** Although the metabolites of some drugs remain in the urine for longer periods of time and may enable the Agency to estimate whether the employee was impaired by those drugs at the time of the covered accident, ... the

delay necessary to procure a warrant ... may result in the destruction of valuable evidence. *Skinner* at ——, 109 S.Ct. at 1416, 103 L.Ed.2d at 664.

and the nature of the search itself." *Id.* 489 U.S. at ——, 109 S.Ct. at 1414, 103 L.Ed.2d at 661 (*quoting United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985)). Accordingly, in making a judgment on whether a search is reasonable under the Fourth Amendment, the search in question "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.,* 489 U.S. at ——, 109 S.Ct. at 1414, 103 L.Ed.2d at 661 (*quoting Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)).

The Court found that the employees covered by the F.R.A. regulations had a diminished expectation of privacy, as the railroad industry is pervasively regulated to ensure employee's fitness for duty. (Most railroads require periodic physical examination of employees involved in the operation of railroad locomotives in order to ensure their health and fitness.)

The Court then assessed the effect of the F.R.A. regulations on the privacy interests of the tested employees, observing that the "intrusions on privacy under the F.R.A. regulations are limited" in that the samples (blood, urine, and breath) were collected in a medical environment, and that the provision of the samples was "not unlike similar procedures encountered in the context of a regular physical examination." *Id.* 489 U.S. at —— and ——, 109 S.Ct. at 1417 and 1418, 103 L.Ed.2d at 664 and 665.

The Court emphasized that the privacy interests of people employed in a regulated industry are not always to be considered minimal, and that some of the privacy interests implicated by the toxicological testing at issue might be viewed as significant in other contexts. But on the facts before it the Court stated that:

"... logic and history show that a diminished expectation of privacy attaches to information relating to the physical condition of covered employees and to this reasonable means of procuring such information."

*Skinner* at ——, 109 S.Ct. at 1419, 103 L.Ed.2d at 667.

The Court then considered the government's interest in testing without a showing of reasonable suspicion and found that the interest was "compelling,":

Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.... [E]mployees who are subject to testing under the F.R.A. regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others. An impaired employee ... will seldom display any outward "signs detectable by the lay person or in many cases, even the physician." 50 Fed.Reg. 31526 (1985)....

*Id.* at ——, 109 S.Ct. at 1419, 103 L.Ed.2d at 667 (footnotes omitted).

As the government's goal in toxicological testing is designed not just to detect impairment, but also to deter drug use, the Court found that post-accident testing was reasonably related to its goals. The Court determined that by informing employees that they would be tested "upon the occurrence of a triggering event, the timing of which no employee can predict with certainty," provided an effective means of deterring them from using drugs or alcohol. The Court reasoned that the employment sanction of discharge for drug or alcohol use would not serve as an effective deterrent unless offenders were aware of potential discovery. But even if the tests disclosed nothing more than recent use of a controlled substance, that information would be relevant to a determination of the employee's fitness. *Id.* at ——, 109 S.Ct. at 1419–20, 103 L.Ed.2d at 668.

Accordingly, the Court held that the required employee drug testing under F.R.A. regulations was reasonable under the Fourth Amendment in the absence of reasonable suspicion that the tested employees were impaired as the government's compelling interests outweighed the railroad employees' reduced expectation of privacy:

... [T]he compelling government interests served by the F.R.A.'s regulations would be significantly hindered if railroads were required to point to specific

facts giving rise to a reasonable suspicion of impairment before testing a given employee.... [And that based] on the present record, the toxicological testing contemplated by the regulations is not an undue infringement on the justifiable expectations of privacy of [the] covered employees....

*Id.* at ——, 109 S.Ct. at 1419, 103 L.Ed.2d at 667 (emphasis added).

On the same day it announced its decision in *Skinner,* the Supreme Court also announced its decision in *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). In that case, the Court upheld the constitutionality of the United States Customs Service's policy of requiring drug testing of all employees of the Service seeking transfer or promotion to positions having a direct involvement in drug interdiction or involving the carrying of a firearm. Using the same analysis that it employed in *Skinner,* in *Von Raab,* the Court initially determined that neither a warrant nor a showing of probable cause was required as the testing program at issue was used for administrative purposes, not for a criminal investigation. *Id.* at ——, ——, 109 S.Ct. at 1390, 1391, 103 L.Ed.2d at 702, 703. The Court also observed that the employees subject to testing knew the circumstances under which tests would be conducted. *Id.* at ——, 109 S.Ct. at 1391, 103 L.Ed.2d at 703.

Focusing on whether this testing required individualized reasonable suspicion, the Court found that the government had a compelling interest in ensuring that Customs Service personnel on the "front-lines" of drug interdiction on the nation's borders were drug-free. *Id.* at ——, 109 S.Ct. at 1392, 103 L.Ed.2d at 704. The Court also found that the Service had a compelling interest in detecting drug users among its personnel who are required to carry firearms, as such employees could cause loss of human life from even a momentary lapse of judgment. *Id.* at ——, 109 S.Ct. at 1393, 103 L.Ed.2d at 705.

In weighing the governmental interest against the effect on the individual employee's expectations of privacy, the Court recognized that certain forms of public employment necessarily involve a diminished expectation of privacy with respect to personal searches. *Id. See also O'Connor v. Ortega,* 480 U.S. 709, 717, 107 S.Ct. 1492, 1501, 94 L.Ed.2d 714 (1987). In this regard, the Court found that Customs employees who carry firearms or who are involved in drug interdiction would reasonably expect an inquiry into their fitness and probity and therefore, have a diminished expectation of privacy. *Von Raab,* 489 U.S. at ——, 109 S.Ct. at 1394, 103 L.Ed.2d at 706.

The Court also found the testing procedures to be minimally intrusive as the employees knew they would be subjected to testing, as the policy enunciated the circumstances under which testing would be required, and the testing procedure utilized was highly accurate.[6]

Based on these findings, the Court concluded that the compelling safety and national security interests advanced by the drug testing policy outweighed the employees' diminished privacy expectations.

Based on the foregoing discussion, the determination of whether a given drug test requires individual reasonable suspicion will require a balancing of the governmental interest in conducting the search against the individual privacy interest implicated by the search. *Skinner v. Railway Labor Executives Ass'n, supra; National Treasury Employees v. Von Raab, supra.*

Thus, after balancing the intrusiveness of the drug testing on the plaintiff's Fourth Amendment right to be free from unreasonable searches by the RTA against the RTA's interest in testing its drivers following the driver's involvement in a collision with a stationary object, this Court finds that RTA's testing of plaintiff in the instant case survives Fourth Amendment

---

**6.** The Custom Service testing program must conform to the United States Department of Health and Human Services (HHS) regulations promulgated in accordance with the recently enacted federal statute (P.L. 100–71, #503, 5 U.S.C.S. § 7301 note).

scrutiny as dictated by the Supreme Court analyses in *Skinner* and *Von Raab*.

## IV

■ A typical RTA bus is 40 feet long, 8½ feet wide, 10 feet high, weighs 13 tons and can accomodate between 44–55 passengers. These buses carry approximately 240,000 persons daily. Bus drivers have the responsibility of safely driving public passengers in these buses through the streets of Greater Cleveland, and just as the train crews in *Skinner* and the armed Customs Service agents in *Von Raab*, these drivers "discharge duties frought with such risks of injury to others than even a momentary lapse of attention can have disastrous consequences." *See Skinner v. Railway Labor Executives Ass'n, supra; National Treasury Employees Union v. Von Raab, supra.*

The RTA's post-accident testing policy, like the F.R.A. regulations challenged in *Skinner,* is designed to deter employees, such as plaintiff in the instant case, who are engaged in safety-sensitive tasks from using drugs such as cocaine in the first place. The RTA has an obligation to insure that its bus drivers are not impaired by the effects of drugs or alcohol while on the job. In addition, the Policy is also designed to detect chronic abusers of drugs and alcohol as there is concern that an employee who engages in drug/alcohol abuse "on his own time" may very well jeopardize the lives of passengers as a consequence of off-duty activity.

Plaintiff, Tanks, was aware of the RTA's policy of testing drivers after certain defined accidents. As noted by the Supreme Court in *Skinner,* where employees are aware that they may be tested upon a triggering event (such as an accident), the timing of which cannot be predicted with any certainty, it follows that the policy will have a deterrent effect.

In *Transport Workers' Union, Local 234 v. SEPTA,* 863 F.2d 1110, 1120 (3d Cir.1988), the Third Circuit Court of Appeals, in sustaining the random testing of a transit authority's bus drivers, relied in part upon expert medical testimony that cocaine injection results in "residual impairment effects" such as irritability, agitation, and lack of alertness and awareness, and that a cocaine user's "functioning becomes depressed and slower, and judgment remains impaired" long after the stimulative effects of the drug have worn off. *Id.* at 1120. *See also* Kaye, Fainstat, *Cerebral Vasculitis Associated With Cocaine Abuse,* J.A.M.A., Oct. 16, 1987 (Vol. 258, No. 15, p. 2104) (discussing the permanent effects on the brain's cognitive functions from chronic cocaine abuse). In light of the evidence connecting impairment with drug use,[7] the RTA has a compelling interest in deterring drivers from drug use, and testing drivers after involvement in a "fault-based" accident to determine whether the "fault" was drug induced.[8]

From the facts presented it is evident that RTA bus drivers, like the railroad train crews in *Skinner* and the customs agents in *Von Raab,* have a diminished expectation of privacy by virtue of their employment framework designed to monitor employees' fitness for duty. As an example, RTA bus drivers, like most railroad employees, are required to take regularly scheduled physical examinations which include eye exams and the provision of a urine specimen. Indeed, plaintiff provided a urine sample at her previous bi-annual physical examination pursuant to RTA's Drug Policy. Moreover, RTA bus drivers can be barred from operating a

---

7. *See also* Yesavage, Leirer, Denari and Hollister, *Carry–Over Effects of Marijuana Intoxication on Aircraft Pilot Performance: A Preliminary Report,* (American Journal of Psychiatry, November 1985 (Vol. 142, No. 11, P. 1325)) (Study of effect of marijuana use on licensed pilots 24 hours after use concluded that mean performance "trends toward impairment" on all variables tested, with "significant impairment" shown in the performance of certain tasks.)

8. In 1987, RTA drivers were involved in 1,076 collision accidents. Out of the 211 drivers tested, 49 tested positive for the presence of drugs and/or alcohol. In 1988, there were 1,036 collision accidents, resulting in 260 drug/alcohol tests; 35 of the 260 drivers tested positive for the presence of drugs and/or alcohol.

vehicle when their health involves a possible safety risk, such as high blood pressure, being overweight, or using prescriptive medication. Drivers are also subjected to detailed reporting requirements and strict disciplinary procedures whenever they are involved in an accident. In addition, bus drivers generally, and plaintiff in particular, were aware that they would be required to submit to a drug and alcohol test during a regularly scheduled physical or after certain accidents.

In the instant case, as in *Skinner* and *Von Raab*, the testing procedures minimize the intrusiveness of the sample collection. Plaintiff provided her blood and urine samples in a medical-type environment. The collection procedure was administered by a trained medical technician. The context of the sample collection process was "not unlike similar procedures encountered in the context of a regular physical examination." *Skinner* at ——, 109 S.Ct. at 1418, 103 L.Ed.2d at 666.[9]

It is undisputed that cocaine use by a public bus driver is a serious problem in light of the overpowering public safety concerns due to physical/psychological effects of such activity. It is also undisputed that Southgate used strict chain of custody procedures in collecting and transporting plaintiff's urine specimen. (Fortner, Butler, and Pitts Affidavits). It is also undisputed that plaintiff's specimen was tested for possible adulteration, and that the EMIT and GC/Ms tests were conducted properly, and that the GC/Ms test is 100% accurate. (Fortner Affidavit).

Based on the foregoing facts, this Court finds that: (1) RTA had a compelling interest in deterring and/or detecting drug and/or alcohol use by employees in safety-sensitive positions; (2) by virtue of the special physical demands of these safety-sensitive positions, these employees have a diminished expectation of privacy as to the intrusions occasioned by such body-fluid testing; (3) the policy of testing drivers

involved in collisions with stationary objects was known to plaintiff, Tanks; (4) the procurement procedures were performed in a medical-clinical setting; (5) the testing was limited and reasonable in scope; (6) the testing procedure was not arbitrary and was used for an administrative and not criminal purpose (the results are never turned over to criminal authorities); and (7) the testing in the instant case bears a close and substantial relationship to RTA's goals of deterrence and/or detection of drug and/or alcohol use by employees in safety-sensitive positions.

Therefore, this Court finds that the body-fluid testing required of plaintiff in the instant case was reasonable under the Federal Constitution's Fourth Amendment, notwithstanding the absence of probable cause or some level of individualized suspicion.

As stated in our opinion in *Holloman v. Greater Cleveland Regional Transit Authority*, No. 88–774, —— F.Supp. —— (N.D. Ohio 1990), this case and cases like *Skinner* are the "forerunners" of more cases to come dealing with issues of the constitutionality of drug testing employees without a "search warrant", "probable cause", or "reasonable, individualized suspicion."

Since *Skinner* and *Von Raab*, there has been movement away from these traditional requirements when finding a search and seizure reasonable under the Fourth Amendment to the Constitution in the context of employee drug testing.

The effects of drug and alcohol use have spread from a social context, affecting private lives, to the workplace where due to the nature of employment in safety-sensitive areas, these effects are endangering the public. This problem has and will continue to affect the analyses of laws pertaining to employee-testing for drug and/or alcohol use.

Thus, an individual's right to privacy in the workplace where drug and/or alcohol use may pose harm and/or danger to the

---

**9.** Southgate employs the same testing procedure, the EMIT test followed by a confirmatory GC/Ms test on all initial positive results, that the Supreme Court expressly endorsed in *Von*

*Raab,* 489 U.S. 656 at ——, n. 2, 109 S.Ct. 1384 at 1394, n. 2, 103 L.Ed.2d 685 at 706, n. 2. (Fortner Affidavit).

public due to the nature of employment, is now in the process of modification.

Legal scholars and "strict constructionists" who believe that any interpretation of the Constitution should adhere to an "original intent" analysis will not be happy with this modification.

Rather than an absolute right to privacy and the mandate of a "search warrant", "probable cause" or "individualized suspicion" before allowing drug testing, we are now talking about an "expectation of privacy" balanced by the public good or public interest.

Historically, the courts have judged the reasonableness of a Fourth Amendment search of an individual on the "probability" of "wrong doing" by that individual or by recognizing the danger posed to policemen under certain circumstances and allowing a "limited" search to reduce the danger posed. But, "the probable cause standard 'is peculiarly related to criminal investigations,' " and may not be helpful when analyzing the reasonableness of routine administrative functions designed to prevent potentially catastrophic events. *Von Raab*, 489 U.S. at ——, 109 S.Ct. at 1391, 103 L.Ed.2d at 703, citing *Camara v. Municipal Court*, 387 U.S. 523, 535–536, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967) (noting that building code inspections, unlike criminal investigation searches, are designed "to prevent even the unintentional development of conditions which are hazardous to public health and safety".) Today, we do no more than that.

We are on the cutting edge of new law. We can anticipate that government agencies will be instituting drug testing, with and without written policies, which will include random testing and testing as part of required physical examinations. In order to survive the required Fourth Amendment balancing, it will be imperative that sufficient safeguards be incorporated to protect "against abuse of official discretion in deciding whom and how to search." *Trans-*

*port Workers' Union*, 863 F.2d 1110 at 1121.

Our cases so far have presented us with questions related to testing employees in safety-sensitive positions after a fault-based accident; the fault being that of the tested employee. Issues presented in future cases may not evidence any fault-based predicate to testing or testing of employees not in safety-sensitive positions. The challenge to the courts will be to carefully examine the facts presented and satisfy the "reasonableness under all the circumstances" standard; the testing in dispute will have to satisfy a rigorous inquiry.

Questions presented in the future could be the effect of these drug testing policies on new and existing employees in situations where the policy was already embodied in an existing collective bargaining agreement or in situations where no agreement was in effect.

Other questions will be whether positions selected for testing are defined more broadly than necessary to meet the purposes of the proposed testing program. When justifying warrantless searches, without probable cause or individualized reasonable suspicion, the courts must first decide whether the search was reasonable at its inception and must consider the nature of the employment and the dangers posed to the public by the use of products and/or equipment, such as trains, planes, busses and other dangerous instrumentalities.

These are some of the issues which will have to be decided. Legal scholars and attorneys need to direct their attention to these yet unaddressed issues.

In the instant case the RTA, a government agency,[10] has presented evidence which has demonstrated the reasonableness of its drug testing policy and its compelling interest in the safety of a substantial portion of Greater Cleveland's population.

---

**10.** As the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private employer, on his own initiative, the Court's opinion in the instant case is limited to "searches" effected by governmental employers. The law applicable to searches in the private sector is different from the law applied in the instant case.

In recognizing the RTA's legitimate compelling interest in protecting the safety of its ridership by detecting and deterring drug use among its bus drivers, the diminished expectation of privacy concerning "fitness information" by such employees, and the limited intrusiveness of the testing this Court finds that RTA's drug policy is reasonable and did not violate plaintiff's constitutional rights as a matter of law.

In reaching our result today, this court does not ignore the text and doctrine of the Fourth Amendment, requiring that "intrusive searches" be reasonable. We have not dispensed with that constitutional requirement. "Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court*, 387 U.S. 523, 537, 87 S.Ct. 1727, 1735. We have in this decision made this balance to arrive at a finding of "reasonableness" when judging searches for administrative purposes of employees in safety-sensitive positions.

Having found that the drug testing required of plaintiff in the instant case was reasonable, we further find that Defendant, Greater Cleveland Regional Transit Authority, did not violate Plaintiff Tank's Fourth Amendment right under the United States Constitution.

Therefore this Court shall grant defendant's motion for summary judgment and shall enter judgment for the Defendant, RTA, and against the plaintiff, Catherine Tanks.