Catherine **TANKS**, Plaintiff–Appellant,

v.

**GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY,** Defendant–Appellee.

No. 90–3494.

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1991.

Decided April 12, 1991.

Alan Belkin (argued), Shapiro, Turoff, Gisser & Belkin, Cleveland, Ohio, for plaintiff-appellant.

Lee J. Hutton (argued), David A. Posner, Andrew C. Meyer, Duvin, Cahn & Barnard, Cleveland, Ohio, for defendant-appellee.

Before MILBURN and BOGGS, Circuit Judges, and GILMORE, District Judge *.

MILBURN, Circuit Judge.

Plaintiff-appellant Catherine Tanks appeals the district court's grant of summary judgment for defendant-appellee Greater Cleveland Regional Transit Authority (GCRTA) in this civil rights action brought under 42 U.S.C. § 1983 challenging GCRTA's drug testing policy. For the reasons that follow, we affirm.

I.

The district court's opinion is reported. *See Tanks v. Greater Cleveland Regional Transit Auth.*, 739 F.Supp. 1113 (N.D.Ohio 1990). The facts, which are not in dispute, are adopted in part from the district court's opinion.

The GCRTA provides public transportation services for approximately 240,000 people daily in Northeastern Ohio. On a typical business day, the GCRTA has over 550 buses in operation. In February 1986, the GCRTA implemented an "Alcohol and Drug Abuse Policy" ("drug policy") designed to detect employees who were using alcohol or drugs on the job, and to deter them from doing so. The drug policy was adopted in response to the widespread problem of alcohol and drug abuse in society in general, and at the GCRTA in particular.

The drug policy lists several circumstances under which employees are required to submit to toxicological testing for the presence of alcohol and drugs. One set

---

* Honorable Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation.

of circumstances, applicable to bus drivers and rail operators, lists eight separate types of accidents, the occurrence of which will result in drug testing. Included among this list is the occurrence of an accident involving a fixed object. All GCRTA employees received a copy of the drug policy, and the policy was also posted at the four garages which service GCRTA buses. Under the drug policy, employees who test positive for cocaine or other hard drugs are terminated.

On September 11, 1986, Catherine Tanks was employed as a bus driver by GCRTA, and she was working a "swing run," whereby she would drive a bus during the morning peak traffic hours, go home for several hours, and return to work to drive during the late afternoon peak traffic hours. After completing her morning run, Tanks struck a stationary pole while driving her bus into a GCRTA garage. Tanks was aware of the drug policy, and she understood that hitting a fixed object was one of the circumstances which required an employee to have a drug test. Tanks reported the accident, and she agreed to accompany GCRTA Zone Supervisor, Edward Butler, to a Southgate Medical Laboratory facility for testing.

At the laboratory, Tanks provided blood, saliva and urine samples. The urine specimen was analyzed for the presence of various psychoactive substances, and initial testing revealed a positive showing of cocaine. Pursuant to established procedures, the laboratory ran a second confirming test on Tanks' urine, employing the gas chromatography/mass spectrometry (GC/MS) test, which provides a "fingerprint" of the molecular structure of the metabolites contained in the urine. The GC/MS test revealed the presence of the cocaine metabolite in Tanks' urine. Accordingly, the laboratory contacted James Clark, the Assistant Director of Bus Transportation for the GCRTA, and advised him that Tanks' urine specimen tested positive for cocaine. The following day, September 17, 1986, Tanks was terminated pursuant to the requirements of GCRTA's drug policy.

On June 30, 1988, Tanks filed the present action under 42 U.S.C. § 1983 alleging that GCRTA, a governmental entity, violated her Fourth Amendment right to be free from an unreasonable search by requiring her to submit to a drug test following her accident on September 11, 1986. Tanks also asserted that her subsequent discharge was unconstitutional because it was based on the unconstitutional search.

After a period of discovery, GCRTA filed a motion for summary judgment on May 1, 1989, asserting that the material facts in the case were not in dispute and that it was entitled to judgment as a matter of law. Tanks filed a brief in opposition to the motion for summary judgment, with no supporting affidavits. On April 25, 1990, the district court granted GCRTA's motion for summary judgment, holding that GCRTA's drug policy was reasonable and did not violate Tanks' constitutional rights as a matter of law.

This timely appeal followed. The principal issue on appeal is whether the GCRTA violated Tanks' constitutional rights by requiring her to submit to a drug test after the bus she was driving collided with a stationary object.

II.

■ Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This court reviews a grant of summary judgment de novo. *Pinney Dock and Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Because there is no genuine dispute as to the material facts in this case, one of the parties is entitled to a judgment as a matter of law. *See Eberhard Foods, Inc. v. Handy*, 868 F.2d 890, 891 (6th Cir.1989).

In granting summary judgment for GCRTA, the district court was guided by the Supreme Court's recent decisions in *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury*

*Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). We shall look to those decisions for guidance in analyzing the present case.

In *Skinner,* the Court upheld the constitutionality of Federal Railroad Administration ("FRA") regulations which mandated or authorized drug testing of train crews following certain accidents. The Court initially recognized that the collection and testing of blood and urine specimens constituted a search under the Fourth Amendment, the reasonableness of which was subject to Fourth Amendment analysis. *Skinner,* 109 S.Ct. at 1413. The Court stated that the reasonableness of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 1414.

The Court next determined that the Fourth Amendment did not require a pretest warrant because the FRA regulations provided little discretion in determining who to test, the testing was conducted for administrative rather than criminal purposes, and the warrant requirement would add little to the certainty and regularity of the process. *Id.* at 1415–16. The Court then noted that a search performed without a warrant must generally be based on "probable cause to believe that the person to be searched has violated the law." *Id.* at 1416–17. The Court added that "[w]hen the balance of interests precludes insistence on a showing of probable cause, we have usually required 'some quantum of individualized suspicion' before concluding that a search is reasonable." *Id.* However, the Court emphasized that "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable." *Id.*

In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.

*Id.* Thus, to determine the reasonableness of the drug testing in *Skinner,* the Court balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.

Under this analysis, the Court determined that the intrusions on privacy to collect blood, breath, and urine samples under the FRA regulations were limited. The Court noted that although the urine test raised greater privacy concerns than did the blood and breath tests, the FRA regulations reduced the intrusiveness of the collection process in that the samples were collected in a medical environment by personnel unrelated to the employer through procedures often encountered in the context of a regular physical examination. *Id.* at 1418.

The Court also determined that the employees covered by the FRA regulations had a diminished expectation of privacy because the railroad industry is pervasively regulated "to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Id.* at 1418. The Court noted that railroad employees have long been a principal focus of regulatory concern because a locomotive "becomes lethal when operated negligently by persons who are under the influence of alcohol or drugs." *Id.* at 1419. Thus, the Court concluded that the testing procedures under the FRA regulations posed "only limited threats to the justifiable expectations of privacy of covered employees." *Id.*

In contrast, the Court concluded that "the government interest in testing without a showing of individualized suspicion is compelling." *Id.* The Court observed that "employees who are subject to testing under the FRA regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others." *Id.* The Court explained that the post-accident testing regulations supply an effective means of deterring employees engaged in safety-sensitive tasks from using controlled substances or alcohol in the first place:

By ensuring that employees in safety-sensitive positions know they will be tested upon the occurrence of a triggering event, the timing of which no employee can predict with certainty, the regulations significantly increase the deterrent effect of the administrative penalties associated with the prohibited conduct, concomitantly increasing the likelihood that employees will forgo using drugs or alcohol while subject to being called for duty.

*Id.* at 1420 (citation omitted). The Court concluded "that the compelling government interests served by the FRA's regulations would be significantly hindered if railroads were required to point to specific facts giving rise to a reasonable suspicion of impairment before testing a given employee." *Id.* at 1421.

At the conclusion of its opinion, the Court provided a concise summary of its ruling:

In light of the limited discretion exercised by the railroad employers under the regulations, the surpassing safety interests served by toxicological tests in this context, and the diminished expectation of privacy that attaches to information pertaining to the fitness of covered employees, we believe that it is reasonable to conduct such tests in the absence of a warrant or reasonable suspicion that any particular employee may be impaired.

*Id.* at 1422. Thus, the Court held that the drug testing required under the FRA regulations was reasonable within the meaning of the Fourth Amendment.

On the same day the Court announced its decision in *Skinner*, it issued a decision in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), holding that the United States Customs Service's suspicionless drug testing of employees applying for promotion to positions involving interdiction of illegal drugs or requiring them to carry firearms was reasonable under the Fourth Amendment. Employing the same balancing analysis used in *Skinner*, the Court concluded that the government's "compelling interests in safeguarding our borders and the public safety outweigh the privacy expectations of employees who seek to be promoted to positions that directly involve the interdiction of illegal drugs or that require the incumbent to carry a firearm." *Id.* 109 S.Ct. at 1396.

In the present case, the district court used the balancing analysis of *Skinner* and *Von Raab* to determine whether GCRTA's drug testing of Tanks violated her constitutional rights. The district court noted that Tanks does not challenge the constitutionality of GCRTA's entire drug policy, but only particular provisions of the policy. The district court balanced the GCRTA's interest in testing its drivers following a collision with a stationary object against the intrusiveness of the drug testing and its impact on Tanks' Fourth Amendment rights. The district court held that GCRTA's testing of Tanks was reasonable under the Fourth Amendment, notwithstanding the absence of probable cause or some level of individualized suspicion. We agree.

If justified by needs other than law enforcement, drug testing "need not necessarily be supported by a warrant, probable cause, or any level of particularized suspicion." *National Fed'n of Federal Employees v. Cheney*, 884 F.2d 603, 608 (D.C. Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990). Under the analytical framework of *Skinner* and *Von Raab*, we must balance the governmental interests furthered by the drug testing against the privacy interests of the tested employee. The warrantless drug testing of Tanks following her collision with the stationary pole was reasonable under the circumstances of this case.

The GCRTA, a governmental entity, had a compelling interest in testing Tanks pursuant to its drug testing policy. As a bus driver, Tanks was responsible for safely transporting passengers through the streets of Greater Cleveland. A bus driver's duties are "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner*, 109 S.Ct. at 1419. Other courts have recognized that the safe operation of public transportation systems

is a compelling governmental interest. *Transportation Workers' Union v. Southeastern Pa. Transp. Auth.*, 884 F.2d 709, 712 (3rd Cir.1989); *Jones v. McKenzie*, 833 F.2d 335, 340 (D.C.Cir.1987), *vacated sub nom. Jenkins v. Jones*, 490 U.S. 1001, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989), *replaced*, 878 F.2d 1476 (D.C.Cir.1989).

Recognizing its responsibility to protect the safety of its passengers and the general public by ensuring that its drivers do not operate buses while under the influence of alcohol or drugs, GCRTA implemented a drug testing policy to detect and deter drug use by its employees. By requiring drivers to undergo drug testing after certain specified accidents, GCRTA's drug policy supplied "an effective means of deterring employees engaged in safety-sensitive tasks from using controlled substances or alcohol in the first place." *Skinner*, 109 S.Ct. at 1419. A collision with a fixed object is "a triggering event, the timing of which no employee can predict with certainty." *Id.* at 1420. Therefore, GCRTA's post-accident testing policy is reasonably related to the compelling governmental interest in protecting public safety.

Tanks argues that the district court ignored the fact that the drug testing resulted from a minor accident which caused minimal property damage and no personal injuries. Tanks is apparently arguing that since the accident was minor and did not result in personal injury to anyone, the drug testing was unreasonable. We reject this argument. "The public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat." *Harmon v. Thornburgh*, 878 F.2d 484, 491 (D.C.Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990) (emphasis in original). Testing drivers after a fault-based accident involving minor property damage and no personal injuries promotes public safety by determining the cause of the accident. *See Skinner*, 109 S.Ct. at 1420. Moreover, it provides an opportunity for intervention before greater harm occurs. *See Harmon*, 878 F.2d at 491.

In this case, the immediacy of the threat and the need for intervention were particularly great because Tanks was working a "swing run" on the day of the accident and would be returning to drive in the afternoon peak traffic hours. This consideration lends additional weight to GCRTA's contention that it had a compelling interest in protecting public safety by testing Tanks after her collision with the stationary pole.

The compelling government interest in protecting public safety must be weighed against the privacy interests implicated by GCRTA's drug testing of Tanks. Tanks had a diminished expectation of privacy by virtue of her employment in a safety-sensitive position, the performance of which was dependent upon her health and fitness. *See Skinner*, 109 S.Ct. at 1418. GCRTA drivers can be barred from driving when their health affects their ability to drive safely. For example, a driver may be barred from driving due to high blood pressure, being overweight, or being on prescription medication. *National Fed'n of Federal Employees v. Cheney*, 884 F.2d 603, 613 (D.C.Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990) (reduced privacy expectations by requirement to report any illness or incident resulting from use of prescription drugs). GCRTA bus drivers are required to undergo biannual physical examinations which include eye exams and the provision of a urine sample, which is tested for drugs and alcohol. Similar intrusions have been held to diminish privacy expectations. *See Skinner*, 109 S.Ct. at 1418; *Von Raab*, 109 S.Ct. at 1397; *Cheney*, 884 F.2d at 613. Under these circumstances, Tanks could not reasonably expect to keep private from her employer information bearing directly on her fitness to perform her job. *Von Raab*, 109 S.Ct. at 1394.

The testing procedures employed in this case posed only limited threats to Tanks' justifiable expectations of privacy. The samples of blood, saliva and urine taken from Tanks were collected in a laboratory environment by a medical technician under conditions very similar to a regular physical examination. *Skinner*, 109 S.Ct. at 1418. Moreover, as the Court indicated in

*Skinner,* "blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity." 109 S.Ct. at 1417. While urine tests do raise greater privacy concerns, the procedure used in Tanks' case reduced the intrusiveness of the collection process in that she was not required to produce the sample under direct observation of a monitor. *Id.* Therefore, we hold that the testing of Tanks posed only limited threats to her justifiable expectations of privacy.

■ Tanks argues that the district court failed to fully consider her privacy expectations "in this factual situation," and that the district court ignored the manner in which the GCRTA has disparately applied its mandatory drug policy. Tanks states that in a grievance arbitration between GCRTA and Amalgamated Transit Union Local 286, AFL–CIO, the union presented three separate bus accidents involving moving vehicles occurring in August 1986, August 1988, and November 1989, which did not result in drug testing of the drivers. Tanks also asserts that the arbitrators determined that GCRTA disparately applied its drug testing policy.

Tanks argues that it was unfair for the GCRTA to subject her to drug testing after she "grazed" a pole in a garage when it did not test other drivers involved in more serious accidents. Tanks contends that the disparate application of the drug policy "could cause employees to misconstrue the level of their legitimate expectations of privacy," and asserts that the undisputed fact that she knew the drug policy was in effect does not determine whether her expectations of privacy were reduced in an atmosphere where the policy was disparately applied.

Although Tanks argues about disparate treatment, she is not asserting an equal protection claim under the Fourteenth Amendment. Rather, she is arguing that GCRTA's disparate application of the drug policy is a factor which the district court failed to consider in determining her privacy expectations. GCRTA asserts that this argument should be rejected because it is being raised for the first time on appeal. GCRTA also contends that Tanks failed to produce any evidence to support her claim of disparate application. GCRTA notes that in Tanks' brief to this court she cites for the first time an arbitration decision in which she claims the arbitrators found that GCRTA disparately applied its drug testing policy. However, the arbitration concerned another GCRTA employee. Moreover, the arbitration decision was not part of the district court record, and Tanks did not attach a copy of the decision to her brief.

Although GCRTA argues that Tanks has raised the disparate application argument for the first time on appeal, Tanks arguably raised the issue under a liberal reading of her memorandum in opposition to GCRTA's motion for summary judgment. *See* J.A. at 77–78. However, Tanks failed to submit any evidence of GCRTA's alleged disparate application of its drug testing policy. In fact, Tanks submitted no evidence in support of her brief in opposition to GCRTA's motion for summary judgment. On appeal, the only evidence of disparate application of the drug testing policy cited by Tanks is the arbitration decision. However, this evidence cannot be considered because it was not part of the district court record. Accordingly, we hold that the district court did not err by failing to consider how Tanks' privacy expectations were affected by the alleged disparate application of the drug testing policy because there was no evidence that GCRTA disparately applied its policy.

In sum, the toxicological testing of Tanks following her collision with a fixed object was reasonable because GCRTA's compelling interest in protecting public safety outweighed Tanks' diminished expectations of privacy. Therefore, the toxicological testing did not violate Tanks' Fourth Amendment rights, and her discharge after testing positive for cocaine was not unconstitutional.

### III.

For the reasons stated, we AFFIRM the granting of summary judgment by the district court.