POLITZ, Chief Judge:
Larry Aubrey, a custodian employed by the Lafayette Parish School Board in an *561 elementary school, seeks injunctive relief and damages because he was subjected to a urinalysis which he contends violated his fourth amendment rights[1] and provisions of the Louisiana Drug Testing Act.[2] He appeals an adverse summary judgment. For the reasons assigned, we affirm.
BACKGROUND
As a custodian at the Prairie Elementary School, Aubrey’s duties included cleaning the fourth and fifth grade bathrooms each day, using various chemicals.[3] He mowed the grounds immediately adjacent to the building and was responsible for securing the premises at the end of the day, making minor repairs to buildings, furniture and equipment, lighting pilot lights, maintaining HVAC equipment, cleaning and replacing light fixtures, and trimming trees. He constantly was in the presence of the young students.
In December 1992, the Board adopted an Employee Drug Testing Policy.[4] In August 1993, Aubrey attended an in-service training for the custodial staff in which the drug testing policy was distributed and reviewed.
Each year the Board submitted a list of “safety sensitive” employees to Security Concepts International, Inc. for random selection and drug testing. On September 28, 1994, the Board requested that Aubrey and fourteen other employees submit to a urinalysis screening. Aubrey’s test indicated the presence of tetrahydrocannabinol,' the active chemical in marihuana. As an alternative to termination, the Board required that Aubrey attend a substance abuse program at the Freedom Recovery Center, Inc. Denying that he had used marihuana, Aubrey sought an injunction barring the Board from firing him, or requiring that he continue to attend the substance abuse program. The district court granted the injunction to the extent that Aubrey was permitted to submit to periodic drug testing and individual as opposed to group therapy treatment.
Thereafter, the district court granted the Board’s motion for summary judgment, dismissing the action in its entirety. Aubrey appealed and we reversed and remanded, concluding that the record did not contain sufficient summary judgment evidence upon which to balance the government’s need to protect children against the intrusion of Aubrey’s fourth amendment rights.[5] We noted a need for additional evidence, including how particular positions were selected and designated as “safety sensitive,” the notice given to employees in such positions, and whether the plaintiffs own position fell within the safety sensitive category.[6]
The Board resubmitted its motion for summary judgment and filed additional evidence addressing our concerns. The district court once again granted the defendant’s motion for summary judgment. Aubrey timely appealed.
ANALYSIS
We review a grant of summary judgment de novo, applying the same standard *562 used by the district court and, in reviewing the facts, we draw all inferences in favor of the nonmoving party.[7] We do not weigh the evidence, assess its probative value, or resolve any factual disputes; rather, we search the record for resolution-determinative facts.[8] Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[9]
The fourth amendment guarantees the privacy, dignity and security of persons against certain arbitrary and invasive acts by officers of the government or those acting at their direction.[10] By virtue of the fourteenth amendment, the fourth amendment governs searches by state as well as federal government officials.[11] Further, the fourth amendment is not limited to searches conducted for law enforcement purposes but extends to all government searches, including those conducted by the government while acting as an employer.[12] This restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion. Searches conducted without grounds for suspicion of particular individuals have been upheld, however, in certain limited circumstances.[13]
A program which compels government employees to submit to urinalysis is a search within the meaning of the fourth amendment because such tests invade reasonable expectations of privacy.[14] Such a drug test therefore must meet the reasonableness requirement. The amendment does not proscribe all searches and seizures, but reasonableness depends on the nature of the search and seizure.[15] In a situation in which the fourth amendment intrusion serves a special government need beyond that of law enforcement, a balancing test is required.[16] The interest of the government must be weighed against the privacy interest of the employee. The analysis of the privacy interest should include not only the desire to be free from mandatory testing, but also the intrusiveness of the particular program at issue.[17]
The Supreme Court has found that special needs may outweigh the privacy interests of individuals. In Skinner v. Railway Labor Executives’ Association,[18] the Court stated:
The Government’s interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, “likewise presents ‘special needs’ beyond normal law enforcement that may justify the departures from the usual warrant and probable-cause requirements.”[19]
Similarly in National Treasury Employees v. Von Raab, the Court found permissible the *563 U.S. Customs Service's drug testing program analyzing urine specimens of employees applying for promotions to positions involving interdiction of illegal drugs and requiring the carrying of firearms.[20]
In Vernonia School District 47J v. Acton,[21] a policy adopted by a school district to test student athletes was held non-violative of fourth amendment protections. The Court stated that “[d]eterring drug use by our Nation’s schoolchildren is at least as important as enhancing efficient enforcement of the Nation’s laws against the importation of drugs, which was the governmental concern in Von Raab or deterring drug use in engineers and trainmen, which was the governmental concern in Skinner.”[22]
In Chandler v. Miller[23] the Supreme .Court’s most recent fourth amendment drug testing case, the Court found violative of the fourth amendment a Georgia statute requiring candidates for state offices to certify that they had tested negative in a drug urinalysis. Georgia failed to show a special need substantial enough to override the candidates’ privacy interests.
Skinner, Von Raab, Acton and Chandler provide guidance with respect to whether' a particular search meets the reasonableness standard, to be determined by balancing the testing program’s intrusion on the individual’s fourth amendment protections against its promotion of legitimate governmental interests.[24]
We first turn to the interests articulated by the Board. The Board contends that the urinalysis was obtained to maintain the safe and efficient operation of its schools, ensure the physical safety of the children of
Lafayette Parish, and decrease the potential spread of drug use among its students. In pursuit of its objectives, the Board created a list of employees who were considered safety sensitive, including custodial employees such as Aubrey. Aubrey’s duties, outlined above, obviously are important to the efficient operation of the school. The tasks assigned to him are important. Despite Aubrey’s efforts to minimize the importance of his duties, we are persuaded that the failure of the Board to use significant caution in the selection and supervision of personnel performing such duties in a school that serves nearly 900 students, ranging in age from three to eleven, could place the children at significant risk.
The Board also asserts that it “has a compelling interest and commitment to eliminate illegal and unauthorized drug use (including the unauthorized use of alcohol), drug users, drug activities, and drug effects from all of its workplaces.” The Board has not produced any summary judgment evidence to demonstrate a problem of drug.abuse or use in its schools, and although such a showing would be of persuasive value, it is not mandatory [25] and such a requirement would present “an unduly narrow view of the context in which the [Board’s] testing program was implemented.” [26] As in Von Raab, “[petitioners do not dispute, nor can there be doubt, that drag abuse is one of the most serious problems confronting our society today.”[27] Unfortunately, neither our workplaces nor our elementary schools are immune from the drug scourge causing such problems in our land. The Board’s program is designed to prevent drug users from obtaining a safety *564 sensitive position and to aid in detecting those employees in such positions who use drugs so that they may undergo treatment as a prerequisite to keeping their jobs. We find the Board’s interests to be substantial indeed.
The Board’s valid and compelling public interests must be weighed against the intrusion and interference with individual liberty that results from requiring the designated safety sensitive employees to undergo a urine test.[28] An employee’s expectation of privacy must be assessed in the context of the employment relation.[29] “[(Operational realities of the workplace may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed,as unreasonable in other contexts.”[30] First, Aubrey had notice that his position as a custodian was specifically designated as safety sensitive and that he would be subjected to random testing after he attended the in-seivice training program. The custodial position was considered safety sensitive because of the handling of potentially dangerous machinery and hazardous substances in an environment including a large number of children ranging in age from three to eleven. Aubrey and other custodial employees “reasonably should expect effective inquiry into their fitness and probity”[31] to operate and use such material in a school setting. The position has a possible impact on the physical safety of the students in their educational environment and the presence of someone using illegal drugs increases the likelihood that" children will have an open avenue to obtain the drugs.[32]
Second, the intrusiveness of the search was minimal. There is no evidence that anyone observed, listened or otherwise monitored the collection of the urine sample. Aubrey produced the sample in privacy. In addition, he was not required to disclose any personal medical information, nor was the urinalysis used to determine the presence of anything other than the presence or absence of drugs.[33] Finally, despite testing positive to marihuana, the Board did not dismiss Aubrey but, rather, required that he submit to a substance abuse program.
It is clear that unlike Chandler, the special need in this case is substantially more than symbolic or a desire to project a public image. In a recent case we addressed the importance of the government’s demonstration of a special need. In Orleans Parish School Board,[34] we held that the School Boards’ policies, requiring all employees to submit to a drug abuse and alcohol screening panel following an accident during the course and scope of their employment, were viola-tive of the fourth amendment. The Boards failed to articulate a special need for the testing, relying solely on a general interest. The Lafayette Parish School Board has demonstrated that it is motivated by the special incentive to protect our most important resource — children. Although the facts in this case differ from Acton in that the school was testing student athletes as opposed to employees, the most significant element in both this case and Acton is that “the Policy was undertaken in furtherance of the government’s responsibilities, under a public school system, as guardian and tutor of children entrusted to its care.”[35] The school system’s role as a guardian does not end with protect *565 ing children from their own actions, but must deter potentially dangerous actions of adults, including school employees, who may have interaction with and influence upon them. We therefore conclude and hold that the Board’s need to conduct the suspicionless searches pursuant to the drug testing policy outweighs the privacy interests of the employees in an elementary school who interact regularly with students, use hazardous substances, operate potentially dangerous equipment, or otherwise pose any threat or danger to the students.
Aubrey also contends that the drug-testing procedure established by the Board is deficient. He insists that the Board violated sections 1006(D)(7)[36] and 1008(C)[37] of the Louisiana Drug Testing Act because the screening laboratory failed to collect split samples.[38] Both sections apply, however, only to “screening laboratories”; meaning a facility which performs drag testing “and which is not NIDA-certified[39] or CAPFUDT[40] certified for forensic urine drug testing____”[41] The laboratory which performed the testing of the subject sample, Laboratory Specialists, Inc., is not considered a screening laboratory and is CAP-FUDT certified. Further, under section 1006, an employer “may, but is not required to, direct each collection site person to collect split samples.” Aubrey’s assertions thus are meritless.
The judgment appealed is AFFIRMED.

. Aubrey contends that his due process rights were violated because the Board did not permit him to take an alternative test. He never challenged the validity of the first test, however, and the record reflects that he refused a retest of the same sample.

. La. R.S. 49:1001, et seg. (West Supp.1997).

. The chemicals used by custodians in cleaning bathrooms included phosphoric acid, butyl carbi-tol, alkyldime thuybenzylam monium chloride, didecyl dimethyl and alkyldimethyl/benzyl am-monoum chloride, octyl dimethyl amine oxide, hydrochloric acid and quaternary ammonium chloride.

. The first clause of the policy's statement of purpose provides: "The children of Louisiana are the greatest natural resource this state provides and their continued safety and health is of serious importance to state and local education agencies. Therefore, the Lafayette Parish School Board has a compelling interest and commitment to eliminate illegal and unauthorized drug use (including the unauthorized use of alcohol), drug users, drug activities, and drug effects from all of its workplaces.”

. Aubrey's notice of appeal indicated he was appealing the dismissal of both the Board and the Center. In his brief, however, he states that he appealed only the grant of summary judgment to the Board. Therefore, the Center's dismissal is not before us. Fed.R.Civ.P. 28. See Zeno v. Great Atlantic & Pacific Tea Co., 803 F.2d 178 (5th Cir.1986).

. Aubrey v. School Board of Lafayette Parish, 92 F.3d 316 (5th Cir.1996).

. Elliott v. Lynn, 38 F.3d 188 (5th Cir.1994).

. FDIC v. Myers, 955 F.2d 348 (5th Cir.1992).

. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

. Camara v. Municipal Court of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); Skinner v. Railway Labor Executives’ Association, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

. New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

. O’Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

. See National Treasury Employees v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); Skinner v. Railway Labor Executives’ Association, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); Chandler v. Miller, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).

. Von Raab, 489 U.S. at 665-666, 109 S.Ct. 1384; Skinner, 489 U.S. at 616-618, 109 S.Ct. 1402.

. United States v. Montoya de Hernandez, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).

. Skinner, 489 U.S. at 619, 109 S.Ct. 1402.

. Acton, 515 U.S. at 652-654, 115 S.Ct. 2386; Skinner, 489 U.S. at 619, 109 S.Ct. 1402.

. 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

. Skinner, 489 U.S. at 620, 109 S.Ct. 1402 (quoting Griffin v. Wisconsin, 483 U.S. 868, 873-874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)).

. National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

. 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

. Acton, 515 U.S. at 661, 115 S.Ct. 2386 (citations omitted).

. 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).

. Acton, 515 U.S. at 652-653, 115 S.Ct. 2386; Von Raab, 489 U.S. at 665-666, 109 S.Ct. 1384; Skinner, 489 U.S. at 619, 109 S.Ct. 1402; Chandler, 117 S.Ct. at 1301;

. Chandler, 117 S.Ct. at 1303 ("A demonstrated problem of drug abuse, while not in all cases necessary to the validity of a drug testing regime, see Von Raab, 489 U.S. at 673-675, 109 S.Ct. 1384, would shore up an assertion of special need for a suspicionlcss general search program.”).

. Von Raab, 489 U.S. at 673-674, 109 S.Ct. 1384.

. Id. at 674, 109 S.Ct. 1384.

. Id. at 671, 109 S.Ct. 1384.

. O’Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); Pierce v. Smith, 117 F.3d 866 (5th Cir.1997).

. Von Raab, 489 U.S. at 671, 109 S.Ct. 1384 (citation and internal quotation omitted).

. Id. at 672, 109 S.Ct. 1384.

. See Hansen v. California Dep't. of Corrections, 920 F.Supp. 1480, 1492 (N.D.Cal.1996)("[P]rison guards who use drugs may be more likely to smuggle drugs to prisoners, as they need money to support their habit, as they may be subject to blackmail if prisoners know of their drug use, and as their drug use may mean that they are less reluctant to violate the law by providing others with drugs.”).

. See Von Raab, 489 U.S. at 672, 109 S.Ct. 1384, Acton, 515 U.S. at 658-659, 115 S.Ct. 2386.

. United Teachers of New Orleans v. Orleans Parish School Board, 142 F.3d 853 (5th Cir.1998).

. Acton, 515 U.S. at 665, 115 S.Ct. 2386.

. La. R.S. 49:1006(D)(7) (West Supp.1997).
D) The employer may, but is not required to, direct each collection site person to collect split samples. If split samples are collected, they shall be collected in according to the following:
7) If the test of the first bottle is confirmed positive, a split sample collected, the employee may request that the medical review officer direct that the second bottle be tested, at the employee's own expense, in an NIDA-certified or CAP-FUDT-certified laboratory for presence of the drug(s) for which a positive result was obtained in the test of the first bottle.

. La. R.S. 49: 1008(C) states:
Screening laboratories shall collect split samples in strict accordance with the provisions of this Chapter. Following collection of split samples, the first sample shall be sealed, labeled, and stored in strict accordance with NIDA guidelines. The second sample shall be analyzed ... in accordance with NIDA guidelines.

. A split sample is defined as a "urine specimen from one individual that is separated into two specimen containers.” La.Rev.Stat. § 49:1001(21)(West Supp.1997).

. National Institute on Drug Abuse.

. College of American Pathologists-forensic urine drug testing.

. La. R.S. 49:1001(20)(West Supp.1997).