# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30020

United States Court of Appeals
Fifth Circuit

**FILED**
November 19, 2014

Lyle W. Cayce
Clerk

JESSE J. BRYANT,

Plaintiff-Appellant

v.

CITY OF MONROE; DON HOPKINS,

Defendants-Appellees

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:12-CV-2378

Before JOLLY and JONES, Circuit Judges, and AFRICK, District Judge.[*]

AFRICK, District Judge:[**]

Plaintiff-Appellant Jesse J. Bryant ("Bryant"), an employee of the City of Monroe ("City"), underwent a suspicionless urine test pursuant to City and departmental drug-testing policies after an on-the-job vehicular accident. He was terminated after testing positive for marijuana use. Bryant filed a lawsuit against the City and his supervisor alleging, as relevant to this appeal, that the urine test was an unreasonable search in violation of the

---

[*] U.S. District Judge for the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-30020

Fourth Amendment to the U.S. Constitution and Article I, § 5 of the Louisiana Constitution, and that his resulting termination violated a collective bargaining agreement ("CBA") and the Due Process Clause of the Fourteenth Amendment. The court below dismissed his claims on summary judgment, finding no violations of the Fourth or Fourteenth Amendments, the Louisiana Constitution, or the CBA because the drug test was a reasonable search which gave the City cause to terminate him. Bryant timely appealed. We AFFIRM.

**I.**

Bryant worked for the City as a labor crew leader in its Public Works Department. His job duties included driving City-owned pickup trucks, supervising and transporting a grounds crew, operating heavy groundskeeping equipment, working with pesticides, and maintaining highway medians.

The City of Monroe prohibits drug use by its employees. The Public Works Department had an Accident/Incident Policy which requires suspicionless drug tests after certain accidents, designated on a sliding scale of "No Fault," "Simple Fault," "Negligent Fault," and "Reckless Fault." As pertains to this appeal, the Policy defines a "Simple Fault" accident or incident as "one which posed minimal danger to life and/or property and . . . was the result of simple inadvertence, e.g. backing into a stationary object." Pursuant to the Accident/Incident Policy, a first-offense "Simple Fault" accident or incident results in a "Written Reprimand" and a "Drug Screen."

The City of Monroe also established by ordinance a separate drug-testing framework ("the City Policy") governing all City employees, which was included in an employee handbook issued to Bryant. Category II of the

No. 14-30020

City Policy requires suspicionless drug testing after certain specified accidents or injuries.[1]

While on the job in November 2011, Bryant drove a City-owned pickup truck carrying crew members and equipment to clear an overgrown vacant lot. As Bryant turned into the lot, the side of the truck brushed up against what is described in the record as a bush or a stump. Although the record appears unsettled regarding whether this damaged the truck, Bryant does not dispute that he hit the bush/stump and that he was at fault in doing so. Three days later, one of the crew members brought this incident to the attention of Bryant's supervisor, Defendant-Appellant Don Hopkins. Following a brief investigation and several delays, eight days after the accident Bryant underwent an unobserved urine test for drug or alcohol use.

The City concedes that when it ordered Bryant to undergo the urine test, it had no basis to suspect that he had used drugs or alcohol. Bryant tested positive for marijuana metabolites. After a second test and additional proceedings, the City fired Bryant.

Bryant filed a § 1983 lawsuit alleging, as relevant to this appeal, that the suspicionless drug test and termination violated his rights under the Fourth Amendment, Article I, § 5 of the Louisiana Constitution, the CBA, and the Due Process Clause of the Fourteenth Amendment. The parties

---

[1] The other testing categories of the City Policy are not implicated in this case. Category I established "random routine" drug testing of employees in "safety sensitive" positions. The drug test in this case was not "random [and] routine" and the City has not argued at any stage of the proceedings that the test was conducted pursuant to Category I. Likewise, the U.S. Magistrate Judge did not analyze or uphold the test administered to Bryant as a Category I "random [and] routine" test. *See Bryant v. City of Monroe*, No. 12-2378, 2013 WL 5924731, at \*9 (W.D. La. Oct. 31, 2013) (noting that the City could have had to wait up to three years before Category I authorized a random routine drug test). Accordingly, Category I is not implicated in this case.

Category III, which governs testing based on reasonable suspicion of substance abuse, and Category IV, which governs testing following an employee's completion of a drug abuse program, do not apply.

consented to proceed before a U.S. Magistrate Judge, who granted defendants' motion for summary judgment. The U.S. Magistrate Judge concluded that the City's drug-testing policy, as applied to Bryant, did not violate his constitutional rights.[2] Bryant timely appealed.

## II.

"We review summary judgment *de novo*, applying the same standard as the district court." *E.g.*, *Thompson v. Mercer*, 762 F.3d 433, 435 (5th Cir. 2014). We review a lower court's "ultimate determination of Fourth Amendment reasonableness *de novo*." *Mack v. City of Abilene*, 461 F.3d 547, 552 (5th Cir. 2006).

## III.

"[S]tate-compelled collection and testing of urine . . . constitutes a 'search' subject to the demands of the Fourth Amendment." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995) (citing *Skinner v. Rwy. Labor Execs. Ass'n*, 489 U.S. 602, 617 (1989)). "To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." *Chandler v. Miller*, 520 U.S. 305, 313 (1997) (citing *Vernonia*, 515 U.S. at 652-53). "But particularized exceptions to the main rule are sometimes warranted based on 'special needs, beyond the normal need for law enforcement.'" *Id.* (quoting *Skinner*, 489 U.S. at 619). Accordingly, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of

---

[2] The U.S. Magistrate Judge also granted summary judgment on Bryant's claim that the test violated Louisiana statutory law. *Bryant*, 2013 WL 5924731, at *12. Bryant does not pursue this claim on appeal.

individualized suspicion in the particular context." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665-66 (1989).

The Supreme Court's decision in *Skinner* is illustrative. In *Skinner*, the Federal Railroad Administration ("FRA") passed regulations requiring drug testing of railroad employees after significant accidents, and authorizing discretionary drug testing after certain specified safety violations. *See* 489 U.S. at 609-11. Presented with a facial Fourth Amendment challenge to the constitutionality of those regulations, the Supreme Court first concluded that public safety is a special, non-law-enforcement need justifying drug testing of safety-sensitive railroad employees as a way of enforcing restrictions on workplace drug and alcohol use. *See id.* at 620-21.

The Supreme Court then examined the reasonableness of the drug testing program by balancing the employees' privacy interests against the government's need to test without individualized suspicion. *See id.* at 624. On the privacy side of the balancing analysis, the Supreme Court concluded that the unobserved urine tests required by the regulations were not a severe privacy intrusion, *see id.* at 626, particularly because the expectations of privacy of the subject employees were significantly reduced by their "participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the[ir] health and fitness," *id.* at 627.

On the other side of the balancing analysis, the Supreme Court concluded that the government's "interest in testing without a showing of individualized suspicion is compelling." *Id.* at 628. First, the Court reasoned that blanket post-accident testing without any requirement of individualized suspicion is "an effective means of deterring employees engaged in safety-sensitive tasks from using controlled substances or alcohol in the first place." *See id.* at 629. Second, the Court reasoned that the drug tests would help the

railroads investigate and respond to accidents by confirming or excluding drug or alcohol use as a factor in both severe accidents as well as lesser incidents which "involve the *potential* for a serious train accident or grave personal injury." *See id.* at 630 (emphasis added and internal quotation marks omitted). Requiring the employer to obtain facts suggesting a particular employee's impairment, "a difficult endeavor in the best of circumstances," and even more difficult in the "chaotic" aftermath of a serious accident, "would seriously impede an employer's ability to obtain this information, despite its obvious importance." *Id.* at 631. Balancing these interests, the Supreme Court concluded that "the Government's compelling interests outweigh privacy concerns." *Id.* at 633. Accordingly, the drug tests were constitutionally reasonable pursuant to the Fourth Amendment. *See id.* at 634.

Applying this "special needs" framework, the Supreme Court has upheld rules or regulations authorizing suspicionless drug tests of Customs employees applying for positions requiring them to carry firearms or directly engage in drug interdiction, *see Von Raab*, 489 U.S. at 679,[3] and student athletes, *see Vernonia*, 515 U.S. at 664-65, but rejected testing of political candidates, *Chandler*, 520 U.S. at 321-22. This Court has applied the same analytical framework to uphold a test of a custodian pursuant to a rule requiring random drug testing of designated safety-sensitive school employees. *See Aubrey v. School Board of Lafayette Parish*, 148 F.3d 559,

---

[3] The testing regulations at issue in *Von Raab* also applied to "employees who seek promotions to positions where they would handle sensitive information." *See* 489 U.S. at 677-78. The Supreme Court affirmed such testing in principle, but could not discern from the appellate record whether all of the categories of employees designated for testing, such as "Animal Caretaker" or "Baggage Clerk," were in fact "likely to gain access to sensitive information." *See id.* Accordingly, the Supreme Court remanded for additional proceedings to decide whether the regulations "defined this category of employees more broadly than is necessary" to address the special need for suspicionless testing. *See id.* at 678.

564-65 (5th Cir. 1998).[4]    Finally, in a decision particularly relevant to these facts, the Sixth Circuit upheld the application of a policy requiring public transportation drivers to undergo a drug test after "an accident involving a fixed object." *See Tanks v. Greater Cleveland Regional Transit Auth.*, 930 F.2d 475, 477, 479 (6th Cir. 1991).[5]

Guided by these cases, the U.S. Magistrate Judge concluded that the test administered to Bryant was a constitutionally reasonable application of both the departmental Accident/Incident Policy and Category II of the City Policy.    *See Bryant*, 2013 WL 5924731, at \*10-11.    On appeal, the parties likewise frame the issues in terms of the "special needs" analysis.

We begin by clarifying the issues presented in this appeal.    First, we find no genuine dispute of fact on this record that the "Simple Fault" testing provision of the Accident/Incident Policy was triggered because Bryant's City-owned vehicle hit the bush as a result of his inadvertence.    Second, although Bryant suggests that the Policy is vague or overbroad, we do not treat this as a facial constitutional challenge.    A suspicionless drug-testing policy may be constitutional as applied to some employees but unconstitutional as applied to others.    *See Von Raab*, 489 U.S. at 678-79.    Accordingly, we address whether the Accident/Incident Policy was constitutional as it was applied to

---

[4] Although *Aubrey* involved a drug test pursuant to a random drug-testing policy and not a post-accident drug-testing policy as in this case, we consider portions of its analysis very relevant to the present matter. *See* 148 F.3d at 561. First, the *Aubrey* panel concluded that the duties of the school custodian, which included using cleaning chemicals, mowing the school grounds, trimming trees, and making minor repairs, were safety-sensitive, *see id.* at 561, 563, which sets a useful benchmark for assessing the safety sensitivity of Bryant's duties. Second, the *Aubrey* analysis regarding the intrusiveness of the drug test and the employee's expectations of privacy informs our analysis here.

[5] Bryant directs us to *United Teachers of New Orleans v. Orleans Parish School Board*, in which we enjoined a suspicionless, no-fault, post-injury drug-testing program of all teachers, teacher's aids, and clerical workers. *See* 142 F.3d 853, 856-57 (5th Cir. 1998). *United Teachers* is not apposite because the challenged testing program required drug tests after workplace injuries without any showing of fault by the employee, as is required by the Accident/Incident Policy in this case. *See id.* at 856.

Bryant on these facts. Third, because we conclude that the drug test was a constitutionally reasonable application of the Accident/Incident Policy, we decline to decide whether the U.S. Magistrate Judge also correctly granted summary judgment based on Category II of the City Policy.[6]

The first question in the *Skinner* analysis is whether the City has articulated a "special need," other than law enforcement,[7] justifying drug testing of employees like Bryant. *See Chandler*, 520 U.S. at 318. The City asserts its interest in public safety, and the Supreme Court has held that public safety is a legitimate, non-law-enforcement interest that justifies drug testing of safety-sensitive employees to enforce prohibitions on drug use. *See Skinner*, 489 U.S. at 620 (testing justified to protect "safety of the traveling public and of the employees themselves"); 489 U.S. at 672 (testing justified to further "Government's compelling interests in safety and in the integrity of our borders"); *see also Chandler*, 520 U.S. at 323 ("[W]here . . . public safety is *not* genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged.") (emphasis added).[8]

---

[6] We note, however, that the U.S. Magistrate Judge's interpretation of Category II of the City Policy, which made superfluous the $500.00 property damage threshold for post-accident drug testing, is not convincing. *See Quarles v. St. Clair*, 711 F.2d 691, 701 n.32 (5th Cir. 1981) ("[I]nterpretations which render parts of a statute inoperative or superfluous are to be avoided.") (internal quotation marks omitted).

[7] The Accident/Incident Policy states that "The Monroe Police Department must be notified in the event of any accident/incident." It is not apparent whether law enforcement was notified after Bryant's incident and neither party addresses this provision.

[8] Although Bryant points out the lack of any identified drug problem in the Public Works Department, such a showing is "not in all cases necessary to the validity of a testing regime." *See Chandler*, 520 U.S. at 319. For example, there was no identified drug problem in *Aubrey*, where we observed that while "such a showing would be of persuasive value, it is not mandatory." *See* 148 F.3d at 559; *see also Von Raab*, 489 U.S. at 673 (upholding suspicionless testing program despite the fact that it "was not implemented in response to any perceived drug problem among Customs employees").

No. 14-30020

Bryant insists that his job duties, including the mere driving of a truck, were not particularly safety-sensitive and, therefore, the City's generalized interest in safety does not extend to testing *him* under these circumstances. As set forth above, his job duties included driving City vehicles and transporting co-workers, operating heavy groundskeeping equipment, handling pesticides, and working in high-risk areas such as highway medians. While these duties may be less safety-sensitive than those of the railroad employees in *Skinner*, *see* 489 U.S. at 620-21, they are on the same level as the duties of the school custodian in *Aubrey* who performed groundskeeping and used cleaning chemicals, which we held to be sufficiently safety-sensitive to justify drug testing. *See* 148 F.3d at 561, 563; *see also Tanks*, 930 F.2d at 480 (holding that a transit agency had a special need to test its drivers because of its "responsibility to protect the safety of its passengers and the general public").[9]  Accordingly, we conclude that there is no genuine dispute of material fact with respect to whether Bryant performed safety-sensitive tasks and that the City sufficiently articulated a special, non-law-enforcement need to test safety-sensitive Public Works Department employees for prohibited drug use.

"The question that remains, then, is whether the [City's] need to monitor compliance with [its drug] restrictions justifies the privacy intrusions at issue absent a warrant or individualized suspicion." *Skinner*, 489 U.S. at 621.  We conduct a balancing test to decide if this is one of the "limited

---

[9] We also note that Category I of the City Policy states that "positions where the health, welfare and/or safety of the public, co-employees and the individual is at risk shall be deemed 'safety sensitive' positions, including but not limited to" "operation of motorized vehicles, including automobiles, trucks, tractors, or other heavy equipment," "positions that entail working in dangerous conditions," and "positions that require the handling or use of chemical substances."  This buttresses our conclusion that Bryant's job duties were genuinely safety-sensitive, despite the fact that we do not uphold the test pursuant to the City Policy.

circumstances[] where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion." *Id.* at 624.

On the privacy side of the constitutional balance, we examine the intrusion on Bryant's justifiable expectations of privacy.  With respect to the intrusiveness of the test itself, the unobserved urine specimen Bryant provided is similar to the test administered in *Aubrey*, which we characterized as minimally intrusive.  *See* 148 F.3d at 564; *see also Skinner*, 489 U.S. at 626 (explaining that unobserved urine testing "reduce[s] the intrusiveness of the collection process").

With respect to Bryant's justifiable expectation of privacy, that expectation "must be assessed in the context of the employment relation." *Aubrey*, 148 F.3d at 564 (citing *O'Connor v. Ortega*, 480 U.S. 709 (1987)).  In *Aubrey*, we held that the plaintiff school custodian's justifiable expectations of privacy were reduced by his awareness that he was designated as safety-sensitive and subject to random testing, and that he should have expected inquiry into his "fitness and probity" to perform his safety-sensitive duties. *See Aubrey*, 148 F.3d at 565 (citing *Von Raab*, 489 U.S. at 671); *see also Von Raab*, 489 U.S. at 672 & n.2 ("[A]pplicants know at the outset that a drug test is a requirement of those positions.").  Like the custodian in *Aubrey*, Bryant knew (or should have known) that he was subject to the Accident/Incident Policy, and he should have expected inquiry into his "fitness and probity" to operate vehicles and groundskeeping equipment through drug testing pursuant to that Policy.  While Bryant's expectation of privacy may be greater than that of the heavily-regulated railroad workers in *Skinner*, *see*

489 U.S. at 627, it is nonetheless reduced by the nature of his position and duties.

On the other side of the balance, we examine the City's "interest in testing without a showing of individualized suspicion." *Id.* at 628.[10] We conclude that the City has a strong interest in the deterrent effect of suspicionless mandatory testing of safety-sensitive employees after a fault-based vehicular collision with an inanimate object. "By ensuring that employees in safety-sensitive positions know they will be tested upon the occurrence of a triggering event, the timing of which no employee can predict with certainty, the [Accident/Incident Policy] significantly increase[s] the deterrent effect" of the City's penalties for drug or alcohol use. *See id.* at 630. This is no less the case after a "Simple Fault" vehicular accident which posed minimal danger, because "[t]esting drivers after a fault-based accident involving minor property damage and no personal injuries . . . . provides an opportunity for intervention *before greater harm occurs*." *Tanks*, 930 F.2d at 480 (emphasis added). A requirement of individualized suspicion before administering such a drug test pursuant to the Accident/Incident Policy would significantly impair this deterrent effect.

The City's interest in testing, absent individualized suspicion, in order to investigate the cause of minor accidents such as this one is less compelling than in *Skinner*, but measurable nonetheless. In *Skinner*, the difficulty of investigating the aftermath of a serious train accident increased the government's need for suspicionless testing to gather "valuable information respecting" causation. *See* 489 U.S. at 630-31. Here, the City would have

---

[10] To reiterate, we are focused on the City's interest in testing Bryant under the circumstances of this case. Because the Accident/Incident Policy expressly defines "backing into a stationary object" as a triggering event, we express no opinion with respect to the City's interest in suspicionless testing of other employees after other hypothetical accidents or incidents potentially covered by the Policy.

less difficulty determining the cause of a "Simple Fault" collision with a stationary object which "posed minimal danger to life and/or property." Nonetheless, the City has a valid interest in ruling out drug or alcohol use as a cause whenever its safety-sensitive Public Works employees drive a City vehicle into an inanimate object, and that interest would be impeded if individualized suspicion were required.  *See Tanks*, 930 F.2d at 480 (holding that the city had an interest in "determining the cause of" a collision with a stationary object even if only minor property damage resulted); *see also Skinner*, 489 U.S. at 631 (explaining that even after less serious accidents, "objective indicia of impairment are absent").

Bryant also points out that because he was not tested until eight days after the incident, the test results were no longer helpful to any investigation and the City's need to test him without individualized suspicion was reduced. The results of the test were still probative despite the delay, however, because "[e]ven if urine test results disclosed nothing more specific than the recent use of controlled substances by a covered employee, this information would provide the basis for further investigative work designed to determine whether the employee used drugs at the relevant times."  *See Skinner*, 489 U.S. at 632.  Moreover, much of the delay was the result of Bryant's failure to report the incident, and the deterrent effect of mandatory post-accident testing would be undermined if an employee could avoid testing by concealing a triggering event from his employer.

Balancing these considerations in the context of the particular facts of this case, we conclude that the City's strong interest in applying a drug-testing policy to a safety-sensitive employee after a vehicular collision with a stationary object outweighs the minimal intrusion on such an employee's reduced expectation of privacy.  Accordingly, we conclude that the drug test

administered to Bryant pursuant to the Accident/Incident Policy was constitutionally reasonable and did not violate his Fourth Amendment rights. We affirm the summary judgment in favor of the City on that claim.

## IV.

Bryant also asserts that the drug test violated Article I, § 5 of the Louisiana Constitution, which states that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." Article I, § 5 "provides greater protection for individual rights than that provided by the Fourth Amendment in some circumstances," *Louisiana v. Jackson*, 764 So. 2d 64, 71 (La. 2000), but we are not convinced that this is one of those circumstances.

Bryant reads too much into the Louisiana Supreme Court's statement in *Richard v. Lafayette Fire & Police Civil Service Board* that "[t]he propriety of a urinalysis test not ordered pursuant to a random drug testing program is appropriately evaluated according to whether the appointing authority had reasonable suspicion that a particular officer was a user of illegal drugs." 8 So. 3d 509, 514 (La. 2009). *Richard* addressed whether a particular set of facts gave rise to reasonable suspicion, not the constitutionality of suspicionless workplace drug testing. Moreover, *Richard* cited *Skinner* as providing the applicable balancing analysis for purposes of both the Louisiana Constitution and the Fourth Amendment, suggesting that both provide the same level of protection with respect to drug testing. *See* 8 So. 3d at 515. Finally, if Bryant's reading of *Richard* is correct, then the Louisiana Supreme Court casually overruled a Louisiana statute expressly allowing programmatic drug testing of a public employee "following an accident in the course and scope of his employment." La. Rev. Stat. § 49:1015(A). We decline

to attribute such a holding to the Louisiana Supreme Court without a more clear statement.

We find nothing in *Richard* to suggest that Article I, § 5 of the Louisiana Constitution sets a higher standard than the Fourth Amendment to the United States Constitution with respect to suspicionless post-accident drug testing.  The drug test administered to Bryant was therefore reasonable pursuant to the Louisiana Constitution for the same reasons set forth above, and the U.S. Magistrate Judge correctly granted summary judgment to the City on that claim as well.

Bryant's remaining claims pursuant to the Due Process Clause of the Fourteenth Amendment and the applicable CBA depend on exclusion of the drug test results as the cause for his termination.  Because we conclude that the drug test was constitutionally reasonable, the City had cause to terminate him.  The U.S. Magistrate Judge correctly granted summary judgment in favor of the City on those claims as well.

For the foregoing reasons, the judgment is AFFIRMED.